UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT MCKNIGHT, JR.,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No.: 1:12-cv-00726 - AWI - JLT<br><br>FINDINGS AND RECOMMENDATIONS GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF, GILBERT MCKNIGHT |

      Gilbert McKnight ("Plaintiff") asserts he is entitled to supplemental security income under Title XVI of the Social Security Act, and seeks judicial review of the decision denying benefits. For the reasons set forth below, the Court recommends the administrative decision be **AFFIRMED**, and Defendant's motion for summary judgment (Doc. 19) be **GRANTED**.

**PROCEDURAL HISTORY**

      Plaintiff filed an application for supplemental security income on September 30, 2008, alleging disability beginning November 1, 2002. (Doc. 15-6 at 2). The Social Security Administration denied his claim initially and upon reconsideration. (Doc. 12-5 at 8, 14). After requesting a hearing, Plaintiff testified before an administrative law judge ("ALJ") on June 1, 2010. (Doc. 15-3 at 37).

      The ALJ noted Plaintiff had filed applications for disability insurance benefits which were denied, and that the doctrine of res judicata made the decisions dated October 27, 2005 and May 28, 2008 binding. (Doc. 15-3 at 21). The ALJ determined Plaintiff was not disabled under the Social

1

Security Act, and issued an order denying benefits on August 24, 2010. *Id.* at 18. Plaintiff requested review by the Appeals Council of Social Security, which denied review of the ALJ's decision on March 1, 2012. *Id*. at 2-4. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish his disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). Once a claimant establishes a prima facie case of

disability, the burden shifts to the Commissioner to show the claimant is able to engage in substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **DETERMINATION OF DISABILITY**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider objective medical evidence and opinion hearing testimony. 20 C.F.R. §§ 416.927, 416.929.

### A. Medical Evidence

Dr. Miguel Hernandez completed a comprehensive internal medicine evaluation on September 21, 2006, at which Plaintiff's chief complaints were chronic low back pain, hepatitis C, and arthritis in his right knee. (Doc. 15-7 at 40). Plaintiff told Dr. Hernandez that he was "unable to walk for very long, maybe 10 minutes at a time, before he has to sit down." *Id.* at 41. However, sitting also could cause some pain in his lower back. *Id.* Plaintiff reported he was no longer able to be a plumber "because it requires a lot of bending, stooping, pulling and carrying heavy equipment." *Id.* Plaintiff told Dr. Hernandez that it was "hard for him to dress and bathe at times" so he needed assistance, and this caused him to be "very depressed." *Id.*

According to Dr. Hernandez, Plaintiff walked with a slight limp on the right, but did not use an assistive device. (Doc. 15-7 at 42). Plaintiff's right knee had "slight swelling, mild effusion," and tenderness. *Id.* His motor strength was "5/5 throughout." *Id.* at 43. Based upon the examination, Dr. Hernandez opined Plaintiff "could be expected to stand and/or walk . . . about six hours with 15-30 minute breaks every two hours" in an eight-hour day. *Id.* He determined Plaintiff could sit "less than six hours with 15-20 minute breaks every two hours due to chronic low back pain." *Id.* Dr. Hernandez did not believe Plaintiff required an assistive device to ambulate, but he had postural limitations "due to chronic low back pain and right knee osteoarthritis." *Id.* at 43-44.

Dr. James Scaramozzino performed a consultative psychiatric examination on October 22, 2006. (Doc. 15-9 at 63-68). Plaintiff told Dr. Scaramozzino that he had "chronic pain …, a depressed mood, sleep disturbance, no appetite, headaches, self-isolation, and [was] easily upset." *Id.* at 63. Plaintiff reported he had been diagnosed with various mental health problems in the past, including "bipolar, schizophrenia, and depression." *Id.* at 64. Dr. Scaramozzino noted:

> [Plaintiff] reports now chronic pain on an average of 10. During this session, he has to change positions several times and could not bend over to pick them up from his report. He appeared to be in significant pain and moved very slowly in and out of the chair and to and from the waiting room.

*Id.* Plaintiff told Dr. Scaramozzino that he was not taking medicine because he no longer had access to medical care. *Id.* In addition, Plaintiff reported he was "arrested at least 30 times for a variety of charges" including drug abuse, burglary and assault, and "incarcerated for over 20 years." *Id.* at 64-65.

Dr. Scaramozzino found there was "no indication" that Plaintiff's prior mental health diagnoses were accurate as of the assessment date. (Doc. 15-9 at 64). Dr. Scaramozzino opined Plaintiff's "mental activity was within normal limits;" his "[t]hought content was appropriate;" and he had "no indications of hallucinations or delusions." *Id.* at 65. In addition, he determined Plaintiff's intellectual functioning was "within the average range," and his "concentration ability was within normal limits." *Id.* at 66. Plaintiff "was able to perform a simple three- step command successfully." *Id.* Accordingly, Dr. Scaramozzino concluded Plaintiff's ability to understand and remember very short and simple instructions as well as detailed instructions was "good," and his "ability to maintain concentration and attention is good to fair influenced by his pain disorder." *Id.* at 67. Dr. Scaramozzino opined Plaintiff had a "fair" ability to interact with coworkers due to a personality disorder, but Plaintiff was "not as aggressive as he used to be" due to pain. *Id.* Dr. Scaramozzino gave Plaintiff a GAF score of 65.[1]

Plaintiff was treated for his pain by several physicians at Heath Services Agency, including Dr. Benjamin Colton. (*See* Doc. 15-8 at 40-54). On August 15, 2007, attending physician Dr. Cohen noted

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.). A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

4

Plaintiff complained of pain behind his right knee that radiated down to his ankles and up to his back. *Id.* at 54.  Plaintiff reported his pain had been there for approximately three years, and was "[r]elieved by prolonged rest, worsened by exertion." *Id.*  Plaintiff had been taking oxycontin, which "was helping," but he ran out. *Id.*  Upon the request of Dr. Colton, Plaintiff had x-rays taken of his right knee on August 17, 2007. *Id.* at 32.  Dr. Grigororpoulos found Plaintiff had "moderate tricompartmental degenerative osteoarthritis with joint space narrowing and articular spurring." *Id.*

Dr. Linda Bobrik treated Plaintiff in the emergency department of Doctors Medical Center on September 23, 2007.  (Doc. 15-8 at 2-4).  Plaintiff reported having "about 6 days of epigastric and upper abdominal pain." *Id.* at 2.  Dr. Bobrik noted an x-ray was taken of Plaintiff's chest, which "show[ed] some changes consistent with COPD." *Id.* at 3.  In addition, Dr. Brian Twedt found Plaintiff had cholelithiasis (gallstones). *Id.* at 16.

On November 13, 2007, Dr. John Martin evaluated three images of Plaintiff's right shoulder and determined he had "moderately severe osteoarthritis in the glenohumeral joint with minor degenerative changes in the acromioclavicular joint."  (Doc. 15-8 at 30; Doc. 15-9 at 5).  Dr. Martin opined Plaintiff had "no recent or past fracture deformity" in his right shoulder. *Id.*

On January 8, 2008, Dr. Cohn treated Plaintiff at Health Services Agency and noted Plaintiff complained of persistent low back pain and leg pain.  (Doc. 15-8 at 50).  Dr. Cohn opined Plaintiff needed "to be placed on chronic pain management" and recommended Methadone. *Id.*  He scheduled an appointment with Dr. Colton's office for January 16, at which Plaintiff reported the Synvisc injection he received for his knee "helped a little." *Id.* at 50-51.

Plaintiff reported that his "pain is much better" after starting Methadone on February 1, 2008.  (Doc. 15-8 at 48).  In March 2008, Dr. Forno noted Plaintiff was "doing well" after having an open cholecystectomy for removal of his gallbladder, and Plaintiff's "chronic pain [was] stable."  (Doc. 15-9 at 15-15; Doc. 15-8 at 46).  Likewise, in April 2008, Dr. Solorza noted Plaintiff was "doing well on Methadone" and the pain in his right knee decreased after the Synvisc injections.  (Doc. 15-8 at 45).  Therefore, Dr. Solorza opined Plaintiff's chronic pain was "controlled on Methadone." *Id.*

Dr. Colton, completed a questionnaire regarding Plaintiff's ability to work on April 9, 2008.  (Doc. 15-9 at 109).  Dr. Colton noted Plaintiff's primary impairment was pain in his back, right

shoulder, and hands. *Id.* He believed Plaintiff was able to stand and/or walk for two hours without a break, and three hours total in an eight-hour period. *Id.* Also, Dr. Colton believed Plaintiff could sit for two hours without a break, and three hours total. *Id.* Dr. Colton optioned Plaintiff's medical problems did not preclude him from performing any full-time work at an exertional level, though the combination of his impairments could "possibly" restrict him to doing no more than sedentary work. *Id.*

Throughout the remainder of 2008, physicians at Health Services Agency continued to opine Plaintiff was doing well on Methadone. (Doc. 15-8 at 43-44; Doc. 15-10 at 16-20). In May 2008, Dr. Gaines noted Plaintiff's "chronic neck & back pain controlled [with] methadone." (Doc. 15-8 at 44). In June, Dr. Gorman noted Plaintiff's pain was "controlled" and Plaintiff was "[a]ble to do yard work now since starting Methadone." *Id.* at 43. In September, Dr. Taher noted Plaintiff was "doing well on Methadone." (Doc. 15-10 at 20). Further, Plaintiff reported to Dr. Gault in October 2008 that he was "doing well [with] good pain control on current meds." *Id.* at 18.

On November 19, 2008, Dr. Roger Fast completed an assessment of Plaintiff's physical residual functional capacity. (Doc. 15-9 at 69-73). Dr. Fast determined Plaintiff was able to lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours in an eight- hour day with normal breaks, and sit for about six hours in an eight-hour day. *Id.* at 70. He opined Plaintiff did not establish postural, manipulative, communicative, or environmental limitations. *Id.* at 71-72. After reviewing the evidence, Dr. Jackson affirmed the assessment of Dr. Fast on March 4, 2009. *Id.* at 103.

Dr. Helen Patterson completed a psychiatric review technique on November 29, 2008. (Doc. 15-9 at 74). She indicated Plaintiff suffered from affective and personality disorders, but opined his impairments were not severe. *Id.* Dr. Patterson noted Plaintiff "sought no treatment for alleged depression" and the medical record from his primary care physician did not "indicate any complaints of symptoms of emotional problems nor observations of signs of [the] same." *Id.* at 86. In addition, she determined Plaintiff had "adequate" concentration, got along with others frequently, and was able to handle changes in routine. *Id.* Dr. Patterson concluded Plaintiff had no restrictions in his activities of daily living, and only "mild" difficulties in maintaining social functioning, concentration, persistence or pace. *Id.* at 84. Dr. Garcia affirmed the finding that Plaintiff's mental impairments were not severe on March 2, 2009. *Id.* at 103.

On December 23, 2008, Plaintiff reported pain in his feet and hands and stated his pain was worse with cold weather and in the morning, though better with stretching. (Doc. 15-10 at 16). On January 22, 2009, Plaintiff complained of worsening pain in his back, hands, shoulders, hips, and legs. *Id.* at 15. Dr. English observed Plaintiff's gait was normal, and recommended physical therapy. *Id.*

Due to complaints of mid and low back pain, Plaintiff had x-rays taken of his thoracic and lumbar spines on February 23, 2009. (Doc. 15-10 at 35). Dr. Robert Anderson determined Plaintiff had "mild spondylosis" in his thoracic spine. *Id.* In addition, Plaintiff had "degenerative disc disease at L5-S1 with reactive facet joint disease." *Id.*

In March 2009, Plaintiff's pain was "stable on meds" and Dr. Colton noted the amount of Methadone may be decreased. (Doc. 15-10 at 14). Accordingly, Plaintiff's prescription for Methadone was reduced at Plaintiff's next visit. *Id.* at 13.

In addition, Plaintiff started physical therapy in April 2009. (Doc. 15-10 at 12-13). Although Plaintiff had difficulty ambulating and developed a slight limp, Plaintiff reported physical therapy "helped some." *Id.* at 12. Plaintiff told Dr. Morris he was still in pain, but was "able to do yard work [and] clean." *Id.* In June 2009, Plaintiff's Methadone prescription was increased because another of his medications was discontinued. *Id.* at 10. Plaintiff reported he felt "relief" with that Methadone dosage and Dr. Shiovitz found Plaintiff's strength was "5/5" on August 4, 2009. *Id.* at 9. According to Dr. Morris, Plaintiff's "chronic pain [was] under control [with] meds" on August 31, 2009. *Id.* at 8.

Plaintiff reported that he had "worked a little recently" in September 2008, and his pain had recently increased. (Doc. 15-10 at 7). In October 4, 2009, Dr. Colton noted Plaintiff "still [complained of] pain in all joints," but observed Plaintiff walked with a "normal gait." *Id.* at 6. In addition, Dr. Colton noted Plaintiff's "chronic pain [was] stable on Methadone." *Id.*

Dr. Colton, completed a second questionnaire regarding Plaintiff's ability to work on November 24, 2009. (Doc. 15-10 at 44). Dr. Colton noted Plaintiff's primary impairment was "arthritis in multiple joints," and indicated his findings were based upon "multiple x-rays showing arthritis." *Id.* He believed Plaintiff was sit for thirty minutes and stand and/or for an hour at one time. *Id.* Over an eight-hour period, Plaintiff was able to sit for "4 hours total" and stand and/or walk for two hours total. *Id.* Dr. Colton did not believe Plaintiff's medical problems precluded him from performing full time

work at any exertion level, including the sedentary level. *Id.* However, Dr. Colton opined Plaintiff was unable to do "prolonged sitting/standing." *Id.*

In December 2009, Plaintiff reported his pain had increased "since weather got cold." (Doc. 15-10 at 4). Further, Plaintiff reported an increase in pain with walking, although the physician observed Plaintiff continued to have a normal gait. *Id.*

On March 5, 2010, Plaintiff reported his pain had "been a little better lately." (Doc. 15-10 at 3). Plaintiff walked with a limp "but ambulate[d] w/out assistance." *Id.* Because he was no longer taking physical therapy, the physician again recommended it for Plaintiff. *Id.*

**B.    Lay Witness Report**

Michelle Clayton, Plaintiff's sister, completed a third party function report on October 7, 2008. (Doc. 15-7 at 32-39). Ms. Clayton noted she spent "five hours a day" with Plaintiff, and she did not believe he was "able to do very much." *Id.* at 32. She reported he would watch the dogs and feed them, "put dishes in the dishwasher & sometimes water[] the lawn." *Id.* Ms. Clayton observed that Plaintiff "lays down a lot due to his pain," but he could "never get comfortable" and did not sleep well. *Id.* at 32-33.

Ms. Clayton reported Plaintiff was able to prepare his own meals twice a day, but was unable to cook. (Doc. 15-7 at 33-34). In addition, Ms. Clayton noted Plaintiff was unable to "concentrate on what things go into his meal." *Id.* at 34. As a result, Plaintiff "mostly" made TV dinners and frozen foods that could be prepared in a microwave. *Id.*

She noted Plaintiff "watche[d] TV off and on every day," talked to people on the phone, and spent time with family. (Doc. 15-7 at 36). However, Ms. Clayton reported Plaintiff did not "like to socialize a lot" and would "stay home all the time now, where he didn't before." *Id.* at 37. She reported Plaintiff went fishing two or three times a year. *Id.* at 36. Because of the pain in Plaintiff's hand he was unable to hold a fishing pole and had to use "a pole holder." *Id.*

According to Ms. Clayton, Plaintiff's pain impaired his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and use his hands. (Doc. 15-7 at 37). She noted Plaintiff could not "walk, stand, [or] use his hands for more than ½ hour at a time." *Id.* Ms. Clayton noted Plaintiff used a walker and cane "at times . . . when he is in alot (sic) of pain," which

8

were prescribed by a physician. *Id.* at 38. Further, she believed Plaintiff's pain medicine "cause[d] him to lose concentration." *Id.* at 37. Ms. Clayton said she would only "allow[] him to drive if he hasn't had any medication that day." *Id.* at 39.

### C. Plaintiff's Testimony

Plaintiff testified before the ALJ at a hearing on June 1, 2010. (Doc. 15-3 at 37). He reported he earned a GED and did not have further schooling. *Id.* at 39. Plaintiff said he had trained as a plumber, and he last worked as a journeyman. *Id.* Plaintiff reported he had not done any work, even for friends, since 2002. *Id.*

According to Plaintiff, his knees were "bad from an [auto] accident." (Doc. 15-3 at 40). He said he "broke about every bone" and had to be in "a body cast." *Id.* He reported that his shoulder injury from the accident "progressed on where it was dislocating all the time," and he had difficulty reaching because of pain in his shoulders and elbows. *Id.* at 41, 54. Plaintiff said his pain increased due to arthritis and "bones, like spurs, growing in [his] hand." *Id.* at 57. He could use his hands for "probably five minutes" before they started hurting. *Id.* at 56-57.

Plaintiff said he used a cane when his right hip was "real bad," which was prescribed by a doctor. (Doc. 15-3 at 52). Plaintiff described the pain he felt as "constant . . . like a knife," and reported that he took prescription medicine for it. *Id.* at 43, 54. However, Plaintiff said the medication caused him to lose his appetite and be dizzy. *Id.* at 43.

He reported he had COPD as a result of smoking. (Doc. 15-3 at 44). Plaintiff said he was trying to quit and cut down from smoking "a pack and a half" to "[a]bout nine cigarettes" each day. *Id.* Plaintiff testified he had not had a drink in approximately two years, and did not use illegal drugs. *Id.* Upon further questioning, Plaintiff explained he had smoked marijuana and "tried the crank and coke and . . . a little bit of heroin." *Id.* at 45. He stated he had not used illegal drugs since about 2000. *Id.*

Further, Plaintiff said had he suffered from depression, paranoia, and auditory hallucinations. (Doc. 15-3 at 45-46). He stated he was not seeking mental health treatment, although he had previously done so "around 2002." *Id.* at 46. Plaintiff stated, "I quit the mental health thing because I got my daughter back. And I couldn't be on the psych drugs and take care of my daughter." *Id.* at 59. He did not believe the mental health symptoms had worsened because he stopped treatment. *Id.*

Plaintiff testified he lived with his sister. (Doc. 15-3 at 47). He said that during the day he would play with their dogs, read, watch television, or go over to his brother's house to take care of his two-year-old niece. *Id.* at 47-48. Plaintiff reported he did not use a computer, but had learned to use one in the past. *Id.* at 49. In addition, he tried to go to church "[a]t least once a month." *Id.* at 50. Plaintiff reported he no longer had a driver's license "[b]ecause of the child support," *Id*. As a result, he would get a ride from his siblings, or use public transportation if they were unavailable. *Id.*

Plaintiff estimated he spent about half of each day sitting in a reclined position. (Doc. 15-3 at 54). He could use his hands for "probably five minutes" before they started hurting. *Id.* at 56-57. According to Plaintiff, he also had problems with concentration. *Id.* at 58. However, Plaintiff said he could watch television and "tell you what happened during the program." *Id.* at 59.

He reported he had served about three years in prison for theft, and was arrested for a parole violation after his initial release. (Doc. 15-3 at 62-63).

### D.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after filing his application on September 29, 2008. (Doc. 15-3 at 23). Second, the ALJ found Plaintiff's severe impairments included: osteoarthritis; a pain disorder; polysubstance dependence, sustained full remission; and an antisocial personality disorder. *Id.* Next, the ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listing, including Listings 12.04 and 12.08. *Id.* at 25.

The ALJ determined Plaintiff had the residual functional capacity ("RFC") "to perform medium work as defined in 20 CFR 416.967(c)." (Doc. 15-3 at 26). However, the ALJ found Plaintiff was "limited to simple repetitive tasks and occasional public contact." *Id.* With this RFC, the ALJ found Plaintiff was able to perform "jobs that exist in significant numbers in the national economy." *Id.* at 29. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 30.

## DISCUSSION AND ANALYSIS

Appealing the opinion of the Commissioner, Plaintiff asserts the ALJ erred by rejecting the opinion of Dr. Colton, failing to give germane reasons to reasons to reject the testimony of Michelle

Clayton, and in finding his subjective complaints lack credibility. (Doc. 18 at 6-9). On the other hand, Defendant contends the decision of the ALJ "should be affirmed because it is supported by substantial evidence and free from legal error." (Doc. 19 at 9).

### A. Evaluation of the opinion of Plaintiff's treating physician, Dr. Colton

In this circuit, cases distinguish three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but is not binding on an ALJ on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

The opinion of a treating physician may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751. An ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ determined the opinion of Dr. Colton should not be given weight because his "treating records do not support" the limitations assessed by Dr. Colton, and were contrary to the medical record. (Doc. 15-3 at 27-28). These may constitute specific, legitimate reasons for rejecting the opinion of Dr. Colton.

The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the decision to discount the opinion of a physician); *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ permissibly rejected treating physician's opinion containing contradictory observations). Furthermore, an ALJ may reject a medical opinion when it is "unsupported by the record as a whole." *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003).

In this case, the ALJ observed the "treating records . . . show signs that the claimant's condition is improving." Specifically, the ALJ noted:

> For example, in October 2008, healthcare providers noted that the claimant was doing well and had good pain control. Later in June 2009, healthcare providers documented that the claimant's right knee osteoarthritis was improving. During this time, the claimant also frequently exhibited a normal gait without any assistive device, full strength with no swelling or edema in the lower extremities, and a full range of motion in the shoulders and knees.

(Doc. 15-3 at 27, citing Exh. 16F). In addition, the ALJ noted Plaintiffs pain "respond[ed] well to conservative treatments, including Synvisc injections, physical therapy, and medications such as Norco, Indomethacin, and Methadone."[2] (Doc. 15-3 at 27, citing Exh. 2F, pg 11-20 and Exh. 16F). Accordingly, the ALJ identified the inconsistencies with the opinion of Dr. Colton and the treatment records from his facility, and supported his determination that Dr. Colton's opinion was not supported by the medical evidence. Thus, the ALJ set forth specific, legitimate reasons for rejecting the opinion of Dr. Colton.

The ALJ's evaluation is supported by substantial evidence in the record. In a Social Security Ruling[3], the Commissioner explained the term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." 1996 SSR 4 LEXIS 9 at *8. Rather, "[i]t need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.* The Ninth Circuit has determined the opinions of non-examining medical experts may constitute substantial evidence when consistent with other independent evidence in the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). As noted by the ALJ, Dr. Fast "concluded that the claimant is capable of a medium range of exertion." (Doc. 15-3 at 28) (citing Exh. 8F). Likewise, Dr. Jackson concluded Plaintiff was able to perform medium exertion work. (Doc. 15-9 at 103). Accordingly, the opinions of Drs. Fast and Jackson

---

[2] Significantly, an ALJ may also reject the opinion of a treating physician who prescribes conservative treatment yet opines the patient (claimant) is disabled. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

[3] Social Security Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

support the RFC determination of the ALJ and his evaluation of the evidence.

**B.     Plaintiff's Credibility**

In evaluating credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 15-3 at 27). However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible . . ." *Id.* Plaintiff acknowledges "the ALJ cited [his] criminal history, daily activities, and inconsistency with the medical record," but asserts "[t]hese reasons were not clear and convincing." (Doc. 18 at 9).

1.     Criminal history

Plaintiff "has a history of over 20 years of incarceration for offences including drug abuse, burglary, and assault." (Doc. 15-3 at 28). The ALJ noted Plaintiff's criminal history "negatively affected" his credibility because "[s]uch a criminal record suggests that the claimant may be capable of dishonest behavior." *Id.*

An ALJ may rely upon a claimant's convictions for crimes of moral turpitude as part of a credibility determination. *Albidrez v. Astrue*, 504 F.Supp.2d 814, 822 (C.D. Cal 2007) ("convictions involving moral turpitude . . . are a proper basis for an adverse credibility determination"); *see also Hardisty v. Astrue,* 592 F.3d 1072, 1080 (9th Cir. 2010) (in ruling on an Equal Access to Justice Act request, the Court held the ALJ's credibility determination was substantially justified when it was

based, among other factors, on the claimant's prior criminal convictions). Here, the ALJ noted Plaintiff had been incarcerated for burglary, which "is a crime involving moral turpitude because it satisfies the threshold of a crime indicating a readiness to do evil." *Meredith v. Lopez*, 2012 U.S. Dist. LEXIS 92187, * 23 n.1 (E.D. Cal. July 2, 2012) (citing *People v. Bothuel*, 205 Cal. App. 3d 581, 595 (1988). Consequently, consideration of Plaintiff's criminal history was proper, and supports the ALJ's adverse credibility determination.

2. Plaintiff's daily activities

When a claimant spends the day engaged in activities that are transferable to a work setting, a finding of this fact may be sufficient to discredit a claimant's allegations of a disabling impairment." *Morgan*, 169 F.3d at 600 (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). A claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances..."). Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

Here, the ALJ noted Plaintiff was "able to watch his grandchildren, play with his niece, care for his dogs, and travel independently within the community." (Doc. 15-3 at 28). In addition, Plaintiff was "able to help around the house, run errands, engage in social interactions with others, and even drive a car." *Id.* The ALJ concluded these activities "were inconsistent with a disabling mental impairment" and showed his alleged mental impairments were "not so severe so as to preclude the claimant from working." *Id.* As the Ninth Circuit explained, "Although the evidence of [the plaintiff's] daily activities may also admit of an interpretation more favorable to [him], the ALJ's interpretation was rational, and [the court] 'must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch*, 400 F.3d at 680 (quoting *Magallanes*, 881 F.2d at 750). Thus, the ALJ's conclusion that Plaintiff's daily activities were consistent with the ability to do "simple repetitive tasks" supports the adverse credibility determination.

### 3. Objective medical evidence

As a general rule, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan*, 169 F.3d at 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."). As noted herein, the ALJ's credibility determination did not rest solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff. Thus, objective medical evidence was a relevant factor in evaluating Plaintiff's credibility.

Moreover, in assessing Plaintiff's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). The treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe medical treatment commensurate with the "supposedly excruciating pain" alleged). Indeed, the Ninth Circuit has "indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007); *see also Tommasetti*, 533 F.3d at 1039 (an ALJ may infer a claimant's "response to conservative treatment undermines [the claimant's] reports regarding the disabling nature of his pain").

Here, the ALJ noted the treatment implemented by physicians to treat Plaintiff's pain was conservative. (Doc. 15-3 at 27). As noted by the ALJ, Plaintiff "respond[ed] well to conservative treatments" and "healthcare providers noted that the claimant was doing well and had good pain control." *Id.* In May 2008, Dr. Gaines noted Plaintiff's pain was "controlled [with] Methadone" and in September 2008, Dr. Taher noted Plaintiff was "doing well on Methadone." (Doc. 15-10 at 20). In October 2008, Plaintiff reported he was "doing well [with] good pain control on current meds." *Id.* at 18. Further, Dr. Morris opined Plaintiff's "chronic pain [was] under control [with] meds" on August

31, 2009. *Id.* at 10. As noted by the ALJ, Plaintiff "has also frequently exhibited a normal gait without any assistive device, full strength with no swelling or edema in the lower extremities, and a full range of motion in the shoulders and knees." (Doc. 15-3 at 27). Importantly, when an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Consequently, the medical record and Plaintiff's response to conservative treatments support the ALJ's credibility determination.

By considering his criminal history, daily activities, and the medical record, the ALJ set for clear and convincing reasons for discounting the credibility of Plaintiff's subjective complaints. Thus, the ALJ satisfied his burden to make "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

**C.     Lay witness testimony**

The ALJ must consider statements of "non-medical sources" including spouses, parents, and other persons in determining the severity of a claimant's symptoms. 20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work."). As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted). To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

Plaintiff asserts that "the ALJ gave insufficient reasons to reject the lay testimony" of Michelle Clayton. (Doc. 18 at 8) (emphasis omitted). Plaintiff notes Ms. Clayton "observed that he had pain limiting kneeling, bending, reaching, walking for long periods, and using his hands for more than 30 minutes," as well as that Plaintiff "had trouble sleeping due to pain and got confused with money." *Id.* (citations omitted). Plaintiff contends these "first hand observations" were "corroborated in the medical evidence from Dr. Colton." *Id.* Plaintiff argues the ALJ "erred harmfully… by ignoring the lay observations and giving less than germane reasons to reject them." *Id.* at 9.

On the other hand, Defendant argues the "credibility findings concerning the function report completed by the lay witness/sister . . . should not be disturbed." (Doc. 19 at 8). Defendant contends that the reasons for rejecting Plaintiff's credibility apply "to [the] similar allegations made by Plaintiff's sister. *Id.* (citing *Molina v. Astrue*, 674 F.3d 1104, 1117 (9th Cir. 2012)).

As Defendant observes, the ALJ found the report of Ms. Clayton "generally concurred with the claimant's alleged symptoms and resulting limitations." (Doc. 15-3 at 27). Giving examples of similar testimony, the ALJ noted: "Ms. Clayton reports that pain significantly limits the claimant's daily activities. Ms. Clayton also reports that the claimant gets confused and forgets things." *Id.* Notably, the Ninth Circuit has determined that when an ALJ states clear and convincing reasons for rejecting the subjective complaints of a plaintiff, and third party testimony is "similar to such complaints," the reasons set forth for rejecting the plaintiff's testimony may be germane reasons for rejecting similar testimony of the third party. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009)).

The ALJ set forth a number of reasons for rejecting the testimony of Ms. Clayton, including Plaintiff's daily activities, the medical evidence, and the fact that "Ms. Clayton ha[s] admitted that the claimant is able to function fairly well." (Doc. 15-3 at 28). As discussed above, Plaintiff's level of activity and the objective medical evidence supported the ALJ's adverse credibility determination, and the reasoning applies equally well to the testimony of Ms. Clayton. *See Molina*, 674 F.3d at 1117; *Valentine*, 574 F.3d at 694.

Further, the facts before the Court are similar to those in *Bayliss*, in which the plaintiff argued the ALJ improperly rejected portions of lay witnesses' testimony. *Bayliss v. Barnhart,* 427 F.3d 1211, 1211 (9th Cir. 2005). There, the ALJ accepted testimony of a lay witness "that was consistent with the record of [her] activities and the objective evidence in the record; he rejected portions of their testimony that did not meet this standard." *Id.* The Ninth Circuit found "inconsistency with medical evidence is one [germane] reason" because "rejection of certain testimony was supported by substantial evidence." *Id.* Likewise, here, the ALJ rejected only portions of Ms. Clayton's statement, and gave Plaintiff "the benefit of the doubt" in finding he has severe mental limitations. (Doc. 15-3 at 28). However, the ALJ determined Plaintiff was physically able to perform medium work, and the finding supported by substantial evidence in the record.

# FINDINGS AND RECOMMENDATIONS

The ALJ set forth specific, legitimate reasons for discounting the opinion of Dr. Colton. In addition, the adverse credibility determination was supported by clear and convincing reasons, including Plaintiff's daily activity, the objective medical evidence, Plaintiff's response to conservative treatment, and his criminal history involving crimes of moral turpitude. Several of these reasons apply equally well to rejecting the lay witness report provided by Ms. Clayton, Plaintiff's sister.

Because the ALJ applied the proper legal standards and substantial evidence supports his findings, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY RECOMMENDED**:

1. The decision of the Commissioner of Social Security be **AFFIRMED**;
2. Defendant's motion for summary judgment be **GRANTED**; and
3. The Clerk of Court be DIRECTED to enter judgment in favor of Defendant Commissioner of Social Security, and against Plaintiff Gilbert McKnight, Jr.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days after being served with these findings and recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the Objections shall be filed and served within fourteen days of the date of service of the Objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **July 17, 2013**              /s/ Jennifer L. Thurston
                                         UNITED STATES MAGISTRATE JUDGE